**CHARTER MEDICAL CORPORATION et al, Appellants,**

v.

**Dr. Michael J. MILLER et al, Appellees.**

**No. 19786.**

Court of Civil Appeals of Texas, Dallas.

July 24, 1980.

Rehearing Denied Sept. 24, 1980.

Marvin S. Sloman, James E. Coleman, Jr., Carrington, Coleman, Sloman & Blumenthal, Ronald W. Kessler, Meyers, Miller & Middleton, Dallas, for appellants.

R. Jack Ayres, Jr., Kelsoe & Ayres, Dallas, for appellees.

Before GUITTARD, C. J., and ROBERTSON and STOREY, JJ.

STOREY, Justice.

Plaintiffs, Miller, Wine and Eusanio, who are doctors of podiatry, sued Mesquite Memorial Hospital, Howard Mulcay, the hospital's administrator and Charter Medical Corporation, owner of the hospital, alleging that the three defendants conspired to interfere with their practice of podiatry and with their doctor–patient contractual relations. Specifically, plaintiffs alleged the conspiracy violated their equal protection and due process rights under federal and state constitutions and their federally protected civil rights. Plaintiffs also alleged the conspiracy invaded their rights of privacy, that defendants engaged in deceptive trade practices prohibited by the Business and Commerce Code, interfered with their business and slandered and disparaged them professionally. Plaintiffs sought damages for loss of earnings and earning capacity, loss of reputation and for physical and mental pain and suffering. They also sought exemplary damages and injunctive relief. The case was submitted on 164 special issues, and all were answered favorably to plaintiffs. Judgment was entered awarding plaintiffs actual damages totalling $550,000, and exemplary damages totalling $1,005,000 and injunctive relief. The appeal is on thirty–six points assigned as error. Stated generally, they assert that prejudicial error resulted from the trial court's denial of defendants' motions for mistrial when it was revealed upon voir dire of the jury panel and thereafter during the course of trial that plaintiffs would charge defendants' counsel as a co–conspirator, although not a named defendant. Defendants contend that, as a consequence, they were denied effective representation at trial. Defendants further urge on appeal that plaintiffs have no federally protected rights to practice podiatry or to privacy, nor are plaintiffs "consumers" within the purview of the Texas Deceptive Trade Practices Act. Defendants also complain that the trial court erred in granting injunctive relief, in certain of its rulings on evidentiary matters and in certain of its special issue submissions. We have concluded that the case must be reversed and remanded because of the trial court's denial of the motions for mistrial; however, we will consider those remaining points urged on appeal which are likely to arise on retrial.

Defendants urge under points of error twenty–two and twenty–three that the court erred in refusing their request to withdraw their announcement of "ready" when it became apparent that their counsel would be named as a co–conspirator; and in refusing their motion for continuance and first motion for mistrial on the same grounds. Under point twenty–four, defendants complain of error in the overruling of about twenty–five additional motions for

mistrial which were made throughout the course of the proceedings. In point of error number twenty–five, they claim the trial court abused its discretion in failing to grant a new trial because of the errors in the three preceding points. Defendants' arguments under these points relate to violations of the Code of Professional Responsibility; that is, interests affecting counsel's judgment, impairment of counsel's utility as a witness and possible conflict of interests between counsel and client. They also urge under these points that they were denied effective representation by counsel.

On the other hand, plaintiffs argue that points twenty–four and twenty–five are not directed to any separate and distinct ruling of the court as required by Tex.R.Civ.P. 418, but instead set forth in general terms a multitude of complaints which are designated to demonstrate that the court abused its discretion in overruling the motion for new trial. This, they reason, leaves only one ruling properly addressed on appeal, namely, the overruling of defendants' first motion for continuance. This ruling, plaintiffs insist, may not be grounds for reversal because the motion for continuance was never reduced to writing or supported by affidavit as required by Tex.R.Civ.P. 251. We do not consider the arguments with respect to the motion for continuance because we disagree with plaintiffs' contention concerning defendants' point of error number twenty–four. While it is true that this point refers to about twenty–five separate rulings of the court, each ruling relates to the identical subject matter, that is, plaintiffs' continuous references to defendants' counsel as a conspirator. We conclude that the overruling of each of these motions for mistrial and the cumulative effect of all of them was prejudicial error, because these repeated references amount to such a denial of the rights of defendants to effective representation as to result in the rendition of an improper judgment.

Tex.R.Civ.P. 434 provides that no judgment shall be reversed on account of prejudicial error "unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment." The rule casts upon the complaining party the burden of showing that the error probably resulted to his prejudice; however, he need not show that, but for the erroneous ruling, a different judgment would have resulted. Rather, the appellate court must determine whether harm probably resulted, and its determination is made from an examination of the record as a whole. *Holmes v. J. C. Penney Co.*, 382 S.W.2d 472 (Tex.1964); *Texas Power & Light Co. v. Hering*, 148 Tex. 350, 224 S.W.2d 191 (1949); *Missouri Pacific Railroad Co. v. Watson*, 346 S.W.2d 640 (Tex. Civ.App.—San Antonio 1961, writ ref'd n. r. e.).

The controversy arose out of changes in the hospital by–laws affecting plaintiff's privileges in admitting patients and performing surgery. On March 5, 1975, plaintiffs had been admitted to hospital privileges at Mesquite Memorial under the category of "clinical consultants," which placed them on parity with dentists and oral surgeons insofar as their patient care and operating room privileges were concerned. In May 1976, the hospital board of directors, on recommendation of the medical staff, adopted revised by–laws which admitted podiatrists as "allied health professionals" and restricted their hospital privileges. They could only admit patients with concurrence of a medical staff member who was made responsible for the patient's overall care. Surgical procedures could only be performed after consultation with and under the direct supervision of a qualified medical staff member. The implementation of these by–law provisions precipitated this conspiracy action.

Plaintiffs alleged that the change in the by–laws resulted from a conspiracy against them on the part of the named defendants "and others acting in concert with them." Defendants' efforts to determine the identity of the unnamed conspirators by special exception and by motion to compel were unsuccessful. For the first time, on voir dire examination of the jury by plaintiffs, the defendants' trial counsel, Frank Bran-

son, was named a co-conspirator in the following terms:

We believe the evidence will show, ladies and gentlemen, that in about April of 1976 that Mr. Frank Branson, one of the attorneys representing the Defendants in this lawsuit, had occasion to be playing racquetball with Dr. K. James Wagner and that he and Dr. Wagner got into a discussion about these doctors and about podiatrists as a whole. We believe the evidence will show at that time that Mr. Branson made statements to Dr. K. James Wagner, who had just become Chief of Staff of the Mesquite Memorial Hospital, to the effect that these men were incompetent, that they were unethical, that they were butchers, and they should not even be admitted on the hospital staff. We believe the evidence will show that those statements of Mr. Branson were because of the fact that he had filed a malpractice lawsuit against two of these doctors in the 101st District Courtroom in this very courthouse down on the third floor. We believe the evidence will show that Mr. Branson was so against these podiatrists that he did all within his power and authority to turn Dr. Wagner, to turn Dr. Mulcay, to turn the hospital staff against these people. And we believe that the evidence will ultimately show to you, ladies and gentlemen, that there was a conspiracy formed between Mr. Mulcay, Dr. Wagner, Charter Medical Corporation, Mesquite Memorial Hospital, and Mr. Branson and Dr. Wagner, that resulted in the enactment of By–Laws that effectively precluded these gentlemen from practicing their profession of podiatry.

At the conclusion of voir dire examination, defendants moved for mistrial and then for continuance in order that counsel be permitted to withdraw and substitute counsel. These motions were made in terms of surprise, prejudice and conflict of interest. They were overruled.

Throughout the course of this lengthy trial, during the examination of witnesses and otherwise, Branson was repeatedly referred to as a co–conspirator. The jury was told that the conspiracy had its inception in the filing of the *Winters* case, a malpractice suit filed by Branson against Drs. Miller and Wine. Thus, Branson was made out to be not only a co–conspirator, but the prime mover of the conspiracy. For example, one witness was asked the question:

[D]o you know of any other reason that Exhibit 13 [the by–laws] would be enacted against these podiatrists ... other than the venom and hatred that has been generated in Wagner by Branson ...

Another witness was asked:

In the interest of fairness, do you believe that Charter Medical was acting fairly in the treatment of these podiatrists in this cause when it deliberately hired a lawyer that it knew had sued these podiatrists and had publicly stated that he would do everything within his power to destroy these podiatrists?

Numerous comments made by Branson about the defendants in the *Winters* case were allowed before the jury in this case. Notable among these were comments that Miller and Wine were "cornchoppers" and "butchers." However inappropriate the comments might have been in the prior case, their admission in evidence in this case served no purpose but to foster prejudice against all defendants. Branson's failure to disavow the statements, if indeed he could, appeared as an admission by all defendants that the statements had been made and, in some manner, approved by them. Defendants' efforts to exculpate themselves by offering testimony from the earlier case which might tend to justify the statements were denied by the court. While the court's exclusion of this exculpatory testimony may have been proper, the offer and exclusion demonstrate the untenable position in which defendants were placed by admission of the prior statements.

No useful purpose would be served by quoting further from the numerous references made to defendants' counsel during the course of trial which occasioned more than thirty motions for mistrial. At least as critical as these references, however, are the comments impugning the character of defendants' counsel made during final argu-

ment because those traits are equated with the defendants themselves. The following are excerpts from plaintiffs' final argument:

> This jury has been forced to endure many instances where people have not honored their oath and it's a disappointment to me and I know that it must be a disappointment to you to see how some members of the medical profession conduct themselves and I know it must be a disappointment to you to see how some members of the legal profession conduct themselves. This is a lawsuit in part about the integrity of the judicial system, about the integrity of the bar, about the integrity of the medical system. Mr. Branson and Mr. Miller are not representative of the legal profession and I hope that you won't consider them as such and go away from this case with that idea in your mind .... I was hoping that Mr. Branson would take the witness stand to tell you what his motives were but he didn't see fit to do that and I think you were entitled to draw reasonable inferences from that, why he didn't do that .... How vicious can you get? If that's not the rankest sort of malice and hatred and ill-will that I have ever experienced and you know Branson, he wants you to believe that he can call these men butchers, butchery .... That's not my kind of lawyer. That's not my kind of man. That man can engender hatred and venom and poison in his mind and he has turned this medical staff out there against these three doctors.

While this case does not squarely present the classic example of a lawyer finding his interests in conflict with those of one or more of his clients during the course of trial, it does present an analogous circumstance and the conclusions reached in those conflict cases apply with equal force to the circumstances of this case. Here, defendants were not parties to nor did they have an interest in the previous litigation. Yet the statements made by their counsel in that case were in direct conflict with their position in this case. Furthermore, any efforts on defendants' part to disprove or disavow the prior statements of counsel could only serve to further discredit one conspirator to the detriment of all co-conspirators. *Cf. J. W. Hill & Sons, Inc. v. Wilson,* 399 S.W.2d 152, 154 (Tex.Civ.App.—San Antonio 1966, writ ref'd n. r. e.) (effect of attorney representing conflicting interests held reversible error).

A closer analogy may be drawn to those cases concerning improper argument of counsel. In *Ramirez v. Acker,* 134 Tex. 647, 138 S.W.2d 1054 (1940), the court confirmed two rules relating to the effect of arguments of counsel:

> One rule is: If counsel goes outside of the record or indulges in inflammatory language in order to influence the jury to return a verdict favorable to his client, or if he gives the jury information not in evidence calculated to injure the opposing side and such argument is not in reply to argument of opposing counsel, this constitutes misconduct and requires a reversal of the case; unless it clearly appears that no injury resulted to the other side. And it is the duty of the court upon its own motion to repress such argument. Where the argument of counsel is so prejudicial or inflammatory that no instruction from the court would cure the error, the duty does not rest upon opposing counsel to object to the argument and request the court to instruct the jury not to consider same.

> .    .    .    .    .

> The second rule is: If the argument is of such a nature or is made under such circumstances that if objection is made at the time so that counsel can offer an explanation or make such corrections as will make such arguments proper or harmless, or if the argument is of such nature that its withdrawal by counsel or instruction by the court to the jury to disregard the same will cure the error and render the effect of the argument harmless, the complaining party must object to such argument and request the court to instruct the jury not to consider same; and failure so to do waives the error.

*Id.* at 1055–56. In *Ramirez*, the court noted that other counsel on the same side of the case as the offending counsel disavowed the argument to the jury and concluded that, had there been objection, a reprimand by the court and an instruction to the jury would have cured the error and the case was therefore affirmed. The case emphasizes, however, the result which must be reached where prejudicial or inflammatory matters are brought before the jury and also the duties of the trial judge with respect thereto.

In *Airline Motor Coaches, Inc. v. Bennett*, 144 Tex. 36, 187 S.W.2d 982 (1945), the court was concerned with argument which accused opposing counsel of unjustly casting insinuations on an innocent woman. The court stated:

> Obviously the argument was prejudicial and inflammatory. The trial court should have sustained the objections made thereto and instructed the jury not to consider it. The trial court having overruled the objection denied to the petitioner a valuable right. The argument having been made with the sanction of the trial court, its prejudicial effect cannot be doubted.
>
> In view of the above stated facts and after a consideration of the record as a whole, we are of the opinion that the argument was reasonably calculated to cause and probably did cause an improper verdict, thereby causing an improper judgment to be rendered in the case. This requires a reversal of the judgments of the lower courts.

*Id.*, 187 S.W.2d at 984.

In *Cross v. Houston Belt & Terminal Railway Co.*, 351 S.W.2d 84 (Tex.Civ.App.— Houston 1961, writ ref'd n. r. e.), the argument was made that "he [plaintiff] placed himself in the hands of these attorneys who had every reason in the world from their financial interest in this case to do everything that they can to hoodwink this Jury from the time that they went shopping for doctors . . . ." Holding the arguments to be improper, inflammatory and prejudicial "in the extreme," the court stated:

> We think such argument was of the incurable type. Possibly the court might

have taken some of the sting out of it by sustaining appellant's timely objection and instructing the jury not to consider it but instead the court stated: "Counsel, I think you can draw emphasis from the testimony." Thus did the court lend its approval to the poignant poison of prejudice injected into the case and improperly comment upon the evidence and the credibility of appellant's witnesses and counsel.

*Id.* at 86.

As we have noted above, this case presents neither a true conflict of interest case nor does it present simply an improper argument case, although it contains elements of both. We have concluded from our examination of the record that compelling defendants' counsel to proceed with trial after being named a conspirator without warning at the beginning of the trial and allowing the admission of evidence regarding the prior trial of a different case deprived these defendants of effective representation, injected incurable prejudice into this case, and denied these defendants the fair adversary trial which our judicial system strives to afford every litigant.

## CONSTITUTIONAL AND FEDERALLY PROTECTED RIGHTS

Special issue number four inquired of the jury whether "two or more of the defendants entered into a conspiracy to violate the civil rights of the plaintiff, Dr. Michael J. Miller, by invidious class–based discrimination." Identical issues were submitted with respect to Doctors Wine and Eusanio and all were accompanied by the following instruction:

> A conspiracy to violate civil rights by invidious class–based discrimination consists of a conspiracy as that term has been heretofore defined which has as a part of its object or purpose an intention on the part of the conspirators to deny the Plaintiffs' civil rights by unequal treatment of Plaintiffs because of the Plaintiffs' membership in a recognizable or identifiable racial, ethnic, or professional group. In this connection, you are

instructed that Plaintiffs have a constitutionally protected civil right to pursue their professions or a common occupation of life and to perform the customary and usual task of their professions without unlawful interference. Discrimination may be inferred from acts or practices which have the purpose or effect of creating inequality in the method and manner of treatment of persons who are members of a recognizable or identifiable racial, ethnic or professional group without reasonable justification or basis in fact for such unequal treatment.

Defendants contend the trial court erred in submitting these issues because plaintiffs failed to establish a federal right subject to redress. On the other hand, plaintiffs insist that because they were members of a recognizable professional group, their constitutional rights to pursue their profession had been violated by the discriminatory act of defendants.

The question presented is whether 42 U.S.C.A. § 1985(3) (1974) gives plaintiffs a cause of action and a right to recover for a private conspiracy. Section 1985(3) provides in pertinent part:

> If two or more persons in any State or Territory conspire to go in disguise on the highway or on the premises of another for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges of the law [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The statute has been held to embrace private conspiracies to deprive citizens of their rights guaranteed by the United States Constitution. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

*Griffin* held that section 1985(3) does not require state action, but reaches private conspiracies where there is a deprivation of rights secured to all citizens by law. Thus, the fact that Charter Medical Corporation and Mesquite Memorial Hospital are privately owned and operated would not serve to negate plaintiffs' cause of action.

*Griffin* was an action by black citizens in Mississippi to recover damages from whites who had conspired to deprive them of their civil rights. The whites stopped the blacks' automobiles on the public highway, assaulted and injured them. The Supreme Court held that section 1985 provided a remedy for plaintiffs because their federally protected right of interstate travel had been violated by the private conspiracy. Therefore, under *Griffin*, before a remedy can be afforded under section 1985, *a federally protected right common to all citizens must be established.* The rationale for this requirement is, in the court's language:

> That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial inferences with the rights of others.

403 U.S. at 101, 91 S.Ct. at 1798.

In a more recent case, *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the court held that section 1985(3) may not be invoked to redress violations of Title VII, which makes it an unlawful employment practice for an employer to discriminate against an employee because he has opposed any employment practice made unlawful by Title VII. The Court said that section 1985(3) creates no substantive rights in itself, and hence the remedial aspects of the statute were inapplicable. Although Title VII creates substantive rights, they cannot be asserted within the remedial framework of 1985(3) because the proof required under *both* laws is different. 442 U.S. at 378, 99 S.Ct. at 2349. Section 1985 was designed to remedy violations of a right guaranteed by the United States Constitution as opposed to a statutorily created right.

■ The question in this case, therefore, is whether plaintiffs have asserted a constitutional right that allows them to avail themselves of the remedial provisions of section 1985. In this connection, the trial court instructed the jury that plaintiffs have a constitutionally protected civil right to pursue their professions or a common occupation of life and to perform the customary and usual task of their professions without unlawful interference. We conclude that this instruction was error. No cases have held that all citizens or any group of citizens as a class have a right to practice podiatry, and therefore plaintiffs fail to bring themselves within section 1985, because they have failed to show that a conspiracy was aimed at a deprivation of rights which are secured by the law to all citizens.

■ Rather than assert a specific constitutional right that has been violated, plaintiffs argue that they have been deprived of "liberty" within the meaning of the Fourteenth Amendment. This argument is deficient because these so-called "natural rights" plaintiffs claim to possess do not come within the defined federal rights for which section 1985 provides a remedy. *See Griffin*, 403 U.S. at 100–101, 91 S.Ct. at 1797. Other cases cited by plaintiffs are not authoritative because they either involved state action or preceded the Supreme Court's decision in *Novotny*. To accept plaintiffs' argument that "liberty" is a defined federal right would extend federal protection under section 1985 to all rights recognized by the general law of torts. This was specifically disavowed in *Griffin*.

■ Similarly, plaintiffs' claims under the Texas Constitution must be denied. The Texas Constitution cannot form the basis for a remedy under section 1985 because *Novotny* specifically limited the remedy under section 1985 to the vindication of otherwise defined federal rights. Moreover, it has been held that equal protection claims under Tex.Const. art. I, § 3, have no reference to the private relations of citizens. *Glasgow v. Terrell*, 100 Tex. 581, 102 S.W. 98, 99 (1907).

■ Nor do we find merit in plaintiffs' claims that they were denied rights of procedural and substantive due process because they had no notice of charges or complaints against them, were not permitted to attend hearings or meetings in which complaints were made, and were not permitted to offer evidence to refute any charges which might have been made against them. The record reveals facts to the contrary. It shows that plaintiffs were present and offered advice and suggestions to the medical staff in connection with the drafting of the 1976 by-laws as they related to podiatrists. Furthermore, there is no evidence that plaintiffs at any time requested a hearing before any official body. Even if these facts were to the contrary, however, the authorities are clear that plaintiffs have no common law rights to procedural or substantive due process. The facts of this case are controlled instead by *Weary v. Baylor University Hospital*, 360 S.W.2d 895 (Tex.Civ.App. —Waco 1962, writ ref'd n. r. e.). In that case, Weary argued that the hospital deprived him of due process in failing to renew his privileges on the medical staff. Weary was given a hearing before the medical staff in order to voice his opinions concerning renewal of his privileges, but he was not permitted to bring witnesses or cross-examine witnesses adverse to his position. The court held that "internal procedures set forth in the Medical Staff By-Laws, even though such By-Laws be approved and adopted by the Governing Board, cannot limit the power of the Governing Board of the Hospital to reappoint or not reappoint a Staff Doctor. We think plaintiff [Weary] has not stated a cause of action against defendant [Baylor Hospital]." *Id.* at 897.

In this case, as in *Weary*, final governing authority was vested in the hospital's board of directors. Moreover, insofar as a physician's personal privilege to use a private hospital facility is concerned, procedural due process is not required. This position was affirmed in *Southern Methodist University v. Smith*, 515 S.W.2d 63 (Tex.Civ. App.—Dallas 1974, writ ref'd n. r. e.). Plaintiff, a college football player, had been

declared ineligible to play football for the University because he accepted illegal payments. The National Collegiate Athletic Association told SMU officials that if plaintiff was not declared ineligible, the university would lose its membership in the N.C.A.A. Plaintiff then sued SMU because he had been denied a hearing. The court held that plaintiff, who possessed a personal privilege to play football, was not entitled to a hearing by SMU because the school was bound by the N.C.A.A. edict. Whatever SMU determined on the basis of a hearing would have no binding effect on the N.C.A.A.'s final decision. Thus, we conclude that on the facts of this case, plaintiffs were not entitled to procedural or substantive due process on the authority of *Weary* and *Smith*. Because we determine that defendants were not bound to afford due process in this case, it is unnecessary to consider the propriety of process actually afforded them.

## DECEPTIVE TRADE PRACTICES ACT

■ Defendants next contend that plaintiffs are not consumers within the meaning of the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.41, et seq. (Vernon Supp. 1980), and therefore it was error to submit issues on whether defendants conspired to "disparage the services or business" of plaintiffs. While not expressly conceding that they were not "consumers" under the act, plaintiffs do not brief this point on appeal but instead insist that we need not make the determination because the issues submitted made no reference to the act and the trial court did not treble damages as provided in the act. Rather, plaintiffs argue that the issues went to a common law action for disparagement. Because defendants have briefed no points on appeal relating to any of the common law actions asserted by plaintiffs, we make no determination concerning a common law action for disparagement or the relationship which, in the context of this case, such an action may have to the remaining common law actions of interference and slander asserted by plaintiffs. However, the question of the application of the Deceptive Trade Practices Act having been raised on appeal

by defendants, we hold on authority of *Hi-Line Electric Co. v. Travelers Insurance Co.*, 587 S.W.2d 488 (Tex.Civ.App.—Dallas 1979, writ ref'd n. r. e.), that plaintiffs are not "consumers" within the meaning of the act.

## PROPRIETY OF PERMANENT INJUNCTION

In the trial court's final judgment, a permanent injunction was issued against defendants enjoining them from enforcing or attempting to enforce the by-laws of the hospital against plaintiffs and from enacting any by-laws or regulation applicable to plaintiffs which is "not based upon objective, professional grounds which shall include, but are not limited to, the qualifications, ability, competence, and demonstrated judgment of the individual practicing podiatrist . . . ." Defendants argue that the injunction must be dissolved because plaintiffs have no right upon which to base an injunction, and furthermore, plaintiffs have failed to demonstrate any resulting irreparable injury. We agree.

■ An injunction may not be granted unless the applicant has an existing, legally cognizable and justifiable right which is threatened and sought to be protected by the injunction. *International Association of Firefighters v. Firemen's & Policemen's Civil Service Commission*, 554 S.W.2d 814, 817 (Tex.Civ.App.—Tyler 1977, no writ); *McCan v. Missouri Pacific Railroad Co.*, 526 S.W.2d 754 (Tex.Civ.App.—Corpus Christi 1975, no writ). Because plaintiffs have failed to demonstrate that a constitutional right has been violated, they are not entitled to the injunctive relief granted. The permanent injunction must therefore be dissolved.

## EVIDENTIARY MATTERS

■ Defendants complain of the court's ruling upon certain evidentiary matters. First, they claim error in the admission of statements made by their counsel in the prior unrelated case in which two of the plaintiffs in this suit were defendants in a medical malpractice case. Here, plaintiffs were allowed to testify that, among other

things, defendants' counsel referred to them in the prior case as "butchers" and threatened to do all in his power to drive them from practice. Objections were made to this testimony on the grounds that statements made in a judicial proceeding were absolutely privileged and that they were hearsay as to these defendants. Plaintiffs, on the other hand, seek to justify their admission as going to show malice and ill will. We cannot agree that the prior statements were absolutely privileged because this privilege extends only to those utterances which are made the basis of a subsequent suit for libel or slander. *Reagan v. Guardian Life Insurance Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (1942). Here, the basis of suit is implementation of the by–law provision and not the prior statements of counsel. We do agree, however, that the prior statements of counsel were hearsay as to these defendants and were not in any manner binding upon them.

Plaintiffs argue on appeal as they did in the trial court that these defendants failed to repudiate the statements and in fact ratified them in their hiring of counsel to represent them in this case. We disagree. One vice inherent in the admission of any hearsay testimony is the inability of the opposing party to repudiate it, and we have pointed out the dilemma confronting these defendants had they attempted to do so. Furthermore, we are not aware of any legal theory upon which any litigant could be held to ratify prior, unsworn statements of his counsel in an unrelated case merely by employing him in a subsequent trial. A lawyer ought not to be inhibited in his representation of one client by fears of having his statements admitted in evidence against other clients in subsequent cases. We conclude that the trial court erred in admitting this testimony for any purpose because it further contributed to the prejudice against these defendants and prevented them from receiving a fair trial.

Defendants also claim error in excluding their offer of the by–laws of other hospitals relating to the privileges extended podiatrists. They urge that these by–laws are relevant to the special issues inquiring whether defendants' by–laws were rational as applied to plaintiffs as well as to the issues on malice and earning capacity. The offered evidence may be relevant to these issues, but the admission of this evidence, even though relevant, is largely left to the discretion of the trial judge. Certain circumstances may be rejected if they create undue prejudice, if they lead away from the main issue, if they consume an undue amount of time, or if they unfairly surprise the opponent. 2 C. McCormick & R. Ray, Texas Law of Evidence § 1481 (Texas Practice 2d ed. 1956); *see also Pound v. Popular Dry Goods Co.*, 139 S.W.2d 341, 343 (Tex. Civ.App.—El Paso 1940, no writ). Here the issue was whether the by–law was rational as applied to these plaintiffs. The admission of the by–laws of other hospitals could well lead to collateral inquiries concerning, for example, the facts presented to other boards which might have motivated them to adopt the same or similar by–laws. The development of these collateral facts could well lead away from the main issues in this case. We conclude, therefore, that no abuse of discretion is shown. On another trial, however, different circumstances might be shown which would lead the trial court to admit the evidence. For example, an examination of the by–law provisions of several other hospitals could reveal that there was such unanimity among other hospitals with respect to the privileges extended podiatrists that an inquiry into the circumstances leading to their adoption would be unnecessary. This should be left to the discretion of the trial judge.

The same rationale applies to the exclusion of defendants' offer of evidence to prove that a part of plaintiffs' attorneys fees were paid by other podiatrists or by an association of podiatrists. Defendants contend this evidence is admissible because the jury is allowed to consider attorney's fees in connection with exemplary damages. The evidence may be relevant to the issue but, again, should be left to the discretion of the trial judge. While we do not consider this evidence to be privileged, as contended by plaintiffs, we do consider whether its probative effect would be outweighed by the probability of its introducing undue preju-

dice and leading away from the main issues in this case. This balancing could be negated by other factors. For example, if it is made apparent in the trial of the case that the attorney's efforts are directed primarily to the interests of others who are not parties to the case as opposed to the interests of his clients in the case at hand, the court may conclude that the evidence should be admitted. We have been cited to no Texas authority on this point nor has our search revealed any. Defendants rely upon authority from other jurisdictions which appear to support their position. These authorities support our conclusion that the evidence is not privileged because a third party has been made privy to it. They also support our rationale that there should be a balancing of factors to determine whether the evidence should be admitted. *See In re Michaelson*, 511 F.2d 882 (9th Cir.), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975); *In re Richardson*, 31 N.J. 391, 157 A.2d 695 (1960). We conclude in this case there was no abuse of discretion in excluding the evidence.

### DAMAGES

Plaintiffs point out that the jury found defendants maliciously conspired to slander them and to disparage and interfere with their business or profession. They urge that these findings are sufficient to support the actual damages found by the jury and because defendants have not raised any points of error on appeal with respect to them, the damage awards must stand. We cannot agree because our conclusion that these defendants were denied a fair adversary trial relates with equal force to the jury findings on the common law actions asserted by plaintiffs. We are compelled, therefore, to reverse the trial court's judgment and to remand for retrial of these actions. Consequently, we do not consider plaintiffs' procedural points relative to the damage issues nor do we address defendants' points regarding excessiveness of the awards.

Reversed and remanded for further proceedings consistent with our above holdings.